**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

SAFFORD'S HEATING, COOLING, AND REFRIGERATION, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ROBERT BOSCH, LLC, ROBERT BOSCH BMGH, TRANE TECHNOLOGIES PLC, TRANE U.S. INC., AND MITSUBISHI ELECTRIC TRANE HVAC US, CARRIER GLOBAL CORP., AND VIESSMANN MANUFACTURING CO., DAIKIN INDUSTRIES, LTD., DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC., DAIKIN APPLIED AMERICAS, THERMALNETICS, LLC, LENNOX INTERNATIONAL, INC., LENNOX INDUSTRIES INC., AND ALLIED AIR ENTERPRISES LLC, RHEEM MANUFACTURING CO., AND HEAT TRANSFER PRODUCTS GROUP, LLC, AAON, INC., a Nevada Corporation, AAON INC. a Oklahoma Corporation, AAON COIL PRODUCTS, INC., and BASX, INC.

Defendants.

No. ____________

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Safford's Heating, Cooling, and Refrigeration ("Plaintiff") brings this antitrust class action lawsuit on behalf of itself and all those similarly situated against Defendants Robert Bosch, LLC, Robert Bosch BMGH (together "Bosch"); Trane Technologies plc, Trane U.S. Inc., and Mitsubishi Electric Trane HVAC US (together "Trane"); Carrier Global Corp., and Viessmann Manufacturing Co. (together "Carrier"); Daikin Industries, Ltd., Daikin Comfort Technologies North America, Inc., Daikan

Applied Americas, ThermalNetics, LLC (together “Daikin”); Lennox International, Inc., Lennox Industries Inc., and Allied Air Enterprises LLC (together “Lennox”); Rheem Manufacturing Co., and Heat Transfer Products Group, LLC (together “Rheem”); and AAON, Inc. Nevada, AAON Inc. Oklahoma, AAON Coil Products, Inc., and BASX, Inc. (together “AAON”), (all collectively “Defendants”), and unnamed co-conspirators for violations of federal and state laws. Based upon personal knowledge and investigation by counsel, Plaintiff alleges as follows:

## I. NATURE OF THIS ACTION

1. Plaintiff brings this action on behalf of itself individually and on behalf of a plaintiff class consisting of all indirect purchasers of HVAC Equipment[1] that purchased HVAC Equipment other than directly from a Defendant or co-conspirator in the United States from at least January 1, 2020 until the present (the “Class Period”), for resale in the course of their HVAC Equipment sales and/or installation businesses. Plaintiff brings this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of several states against Defendants and demand a trial by jury. Plaintiff alleges that Defendants conspired to fix, raise, maintain, and/or stabilize HVAC Equipment prices, thereby artificially inflating prices paid by purchasers of HVAC Equipment. As a result of Defendants’ unlawful conduct, Plaintiff and the other class

[1] For purposes of this Complaint, HVAC Equipment is defined as the appliances used in residential and commercial ducted heating, ventilation, and cooling systems.

members suffered antitrust injury for which Plaintiff seeks treble damages and injunctive relief.

2. Defendants are the leading manufacturers of HVAC Equipment in the United States, having obtained larger and larger shares of the market through years consolidation. The Defendants represent over 90 percent of the market for HVAC Equipment in the United States.

3. Plaintiff and members of the Class are those who purchased HVAC Equipment indirectly for use in their business of reselling and/or installation of HVAC Equipment.

4. Heating, Ventilation, and Air Conditioning ("HVAC") Equipment regulates indoor environments by providing thermal comfort, managing humidity, and improving air quality in residential and commercial buildings.

5. HVAC Equipment functions by heating, cooling, and circulating air, often using furnaces for heat, air conditioners for cooling, and ductwork to distribute air throughout a space. There are several types of HVAC Equipment, including air conditioner condensers, heat pumps, furnaces, air handlers, rooftop units, split systems, chillers, and variable refrigerant flow systems.

6. American homes often require HVAC systems in order to maintain a comfortable and healthy environment.

7. The United States HVAC market was approximately over $31 billion in 2025 and is projected to grow consistently over the next decade.

8. HVAC Equipment is produced through a standardized process that results in a commodity product. In the United States, the manufacturing of HVAC Equipment is highly regulated by industry standards that have been in place for many years, leading to limited product differentiation. The technology and processes for manufacturing HVAC Equipment are well-established. Demand for HVAC Equipment is relatively stable due to their frequency of use in residential and commercial properties and the life cycle of HVAC Equipment, which require periodic maintenance and replacement.

9. HVAC Equipment can be quite costly. For example, heat pump installation costs can range from $10,000 to $30,000. Defendant Carrier estimates that on average, air conditioner costs range from $3,000 to $15,000. These costs often require consumers and businesses to take out financing to afford HVAC Equipment, and require hiring of professionals to install and maintain the equipment. These prices, as detailed herein, have skyrocketed in the last few years as a result of Defendants' conspiracy.

10. During the Class Period, Plaintiff alleges that Defendants conspired to fix, raise, maintain, and stabilize the price of HVAC Equipment in the United States beginning in 2020. As a result, Plaintiff and the Class members paid prices for HVAC Equipment higher than they would have absent Defendants' conspiracy.

11. To cover their rapid price increases Defendants sought to blame a number of external sources, including the COVID-19 pandemic and resulting cost increases, updated energy efficiency standards, and the phasedown of hydrofluorocarbons ("HFCs") mandated by the American Innovation and Manufacturing ("AIM") Act of 2020. However,

none of these are sufficient explanations for HVAC Equipment price increases experienced by Plaintiff and the Class.

12. According to public data, the Producer Price Index by Industry: Air-Conditioning, Refrigeration, and Forced Air Heating Equipment Manufacturing (the "HVAC PPI") broke from historic trends near the start of the conspiracy, outpacing increases in the Consumer Price Index ("CPI"), which reflects the average change over time in the prices paid by consumers for a market basket of consumer goods and services, as shown in **Figure 1**:

**FIGURE 1: HVAC PPI v. CPI**[2]




13. HVAC PPI also outpaced increases in the Producer Price Index by Industry: Major Household Appliance Manufacturing ("Household Appliance PPI"), which reflects prices paid by consumers for a basket of home appliances and equipment, and more closely tracked CPI, as shown in **Figure 2**:

---

[2] Federal Reserve Bank or St. Louis, Federal Reserve Economic Data Producer Price Indexes & Consumer Prices Index (last visited Apr. 3, 2026).

**FIGURE 2: HVAC PPI v. Household Appliance PPI v. CPI [3]**




14. Updated energy conservation standards also do not explain away price hikes, as Defendants had, at a minimum, six years to develop compliant HVAC Equipment.

15. Finally, the HVAC Equipment industry itself led domestic efforts to phase out HFCs, investing billions in the transition and beginning their advocacy over 20 years before the restrictions took effect in 2025. They were well aware of, and had planned for, the effects this phase out would have on their operations.

16. None of the excuses publicly offered by Defendants tell the true story: that Defendants colluded during the Class Period to inflate prices for HVAC Equipment at levels higher than prices that would have been had the market been competitive. As a direct result, Plaintiff and class members suffered antitrust injury by paying illegally inflated prices for HVAC Equipment they purchased.

[3] Federal Reserve Bank or St. Louis, Federal Reserve Economic Data Producer Price Indexes & Consumer Prices Index (last visited Apr. 3, 2026).

## II. JURISDICTION AND VENUE

17. Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiff also brings these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct in increasing the price of HVAC Equipment. Plaintiff seeks damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

18. Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

19. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of HVAC Equipment throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing

injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

20. The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

21. No other forum would be more convenient for the parties and witnesses to litigate this case.

## III. PARTIES

### A. Plaintiff

22. Plaintiff Safford's Heating, Cooling, and Refrigeration, operates a HVAC Equipment installation business in Findley Lake, New York. During the Class Period, Plaintiff purchased HVAC Equipment, once or more, other than directly from Defendants or entities owned or controlled by Defendants, for resale to residential or commercial customers. The HVAC Equipment purchased by Plaintiff was impacted by the conduct of one or more of the Defendants, constituting an antitrust violation as alleged herein, and plaintiff suffered monetary loss as a result of the antitrust violations alleged herein.

### B. Defendants

#### 1. The Bosch Defendants

23. Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH and serves as the corporate headquarters for North America. It is located in Farmington Hills, Michigan.

24. Robert Bosch GmbH is a publicly traded corporation headquartered and incorporated in Gerlingen, Baden-Wurttemberg, Germany. Robert Bosch GmbH's United States corporate headquarters are located in Farmington Hills, Michigan. Robert Bosch GmbH manufactures and markets HVAC Equipment under several different brands and product lines, including Bosch, York, Champion, Coleman IVT, Luxaire, Hitachi, TempMaster, Guardian, and others. During the Class Period, Robert Bosch GmbH and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

25. Bosch produces heat pumps, geothermal water pumps, residential and commercial heat pump systems, commercial packaged rooftop and split units, air handling units, various furnaces, and air purifiers, among other pieces of equipment. Bosch offers a range of products within each category of HVAC Equipment, including through other brand names.

**2. The Trane Defendants**

26. Trane Technologies plc ("Trane Technologies") is a publicly traded corporation headquartered and incorporated in Dublin, Ireland. Trane's North American and United States headquarters are located in Davidson, North Carolina. In 2008, Ingersoll Rand Inc. acquired Trane Technologies plc for $10.1 billion, holding it as a subsidiary before spinning it off into a dedicated climate control company in March 2020. Trane Technologies operates commercial sales offices for HVAC Equipment in both Flint and

Livonia, Michigan. Trane Technologies also operates an HVAC Equipment commercial manufacturing operation in Grand Rapids, Michigan. Trane Technologies manufactures and markets HVAC Equipment under several different brands and product lines, including Trane, American Standard, RunTru, Ameristar, Oxbox, and others. During the Class Period, Trane and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

27. Trane U.S. Inc. is a manufacturer of HVAC systems, building management controls, and energy-efficient indoor climate solutions for residential and commercial applications. Trane U.S. Inc. is a subsidiary of Trane Technologies plc.

28. Mitsubishi Electric Trane HVAC US is a 50/50 joint venture between Trane Technologies plc and Mitsubishi Electric US, Inc., formed in 2018. The joint venture distributes products under the Mitsubishi Electric brand, as well as specific Trane and American Standard branded systems. Mitsubishi Electric Trane HVAC US is headquartered in Suwanee, Georgia.

29. Trane produces residential products such as air conditioners, furnaces, and heat pumps. Trane's line of commercial products includes airside equipment, chillers, commercial heat pumps, cooler distribution units, packaged units and split systems, VRF heating and cooling systems; and geothermal pumps. Trane offers a range of products within each of these categories of HVAC Equipment, including through other brand names.

### 3. The Carrier Defendants

30. Carrier Global Corp. ("Carrier Global") is a publicly traded Delaware corporation headquartered in Palm Beach Gardens, Florida. Carrier Global manufactures and markets HVAC Equipment under several different brands and product lines, including Carrier, Bryant, Toshiba, Payne, Tempstar, Airquest, Arcoaire, Beretta, Comfortmaker, Heil, Keeprite, Day & Night, Viessmann, and others.

31. Viessmann Manufacturing Co. (U.S.), Inc. is part of the larger Viessmann Climate Solutions entity that Carrier acquired in 2024 and was Viessmann's primary manufacturing and distribution facility in the United States. It is now a subsidiary of Carrier and is located in Warwick, Rhode Island. Carrier, as used herein, includes Viessmann Manufacturing Co. (U.S.), Inc.

32. The Carrier Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment.

33. Carrier produces residential products such as air conditioners, furnaces, heat pumps, crossover solutions, evaporator coils, geothermal pumps, and fan coils. Carrier's line of commercial products includes chillers, packaged indoor and outdoor units, split systems and condensers, and VRF systems. Carrier offers a range of products within each category of HVAC Equipment, including through other brand names.

### 4. The Daikin Defendants

34. Daikin Industries, Ltd. ("Daikin") is a publicly traded corporation headquartered and incorporated in Osaka, Japan. Daikin's United States corporate

headquarters are located in New York, New York. In 2022, Daikin acquired ThermalNetics, an HVAC Equipment sales and services provider that is headquartered in Auburn Hills, Michigan. Daikin manufactures and markets HVAC Equipment under several different brands and product lines, including Daikin, Amana, Goodman, and others. During the Class Period, Daikin and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States

35. Daikin Comfort Technologies North America, Inc. is a subsidiary of Daikin Industries, Ltd., based in Waller, Texas. Daikin Comfort Technologies North America, Inc. engineers, manufactures, markets, and sells HVAC Equipment under several brands and product lines. Daikin Industries, Ltd. changed the name of its United States subsidiary Goodman Global Group, Inc. to Daikin Comfort Technologies North America, Inc., in April 2022.

36. Daikin Applied Americas is a subsidiary of Daikin Industries, Ltd., based in Minneapolis, Minnesota. Daikin Applied Americas manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

37. ThermalNetics, LLC is a subsidiary of Daikin Industries, Ltd., based in Auburn Hills, Michigan. ThermalNetics manufactures and markets HVAC Equipment under the Daikin brand and several product lines.

38. The Daikin Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment.

39. Daikin produces a range of residential and commercial products such as split/multi-split type air conditioners, unitary (ducted split) systems, air to water heat pump systems, air purifiers, heating systems, packaged air conditioners, medium/low temperature refrigeration, ventilation products, rooftop systems, air cooled chillers, water cooled chillers, airside equipment, and VRV systems. Daikin offers a range of products within each category of HVAC Equipment, including under other brand names.

### 5. The Lennox Defendants

40. Lennox International, Inc. ("Lennox International") is a publicly traded Delaware corporation headquartered in Richardson, Texas. During the Class Period, Lennox International and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

41. Lennox Industries Inc. ("Lennox Industries") is a wholly owned subsidiary of Lennox International. Lennox Industries is a Delaware corporation headquartered in Richardson, Texas. Lennox Industries manufactures and markets HVAC Equipment under the Lennox brand and several product lines.

42. Allied Air Enterprises LLC ("Allied Air") is a wholly owned subsidiary of Lennox Industries, Inc. Allied Air is a Delaware limited liability company headquartered in West Columbia, South Carolina. Allied Air manufactures and markets HVAC Equipment under several different brands and product lines, including Allied, Allied Commercial, Armstrong Air, AirEase, Ducane, and Concord.

43. The Lennox Defendants are manufacturers of HVAC Equipment in the United States, including, both residential and commercial HVAC Equipment

44. Lennox produces a range of residential and commercial products such as air conditioners, heat pumps, furnaces, air handlers, packaged units, water heaters, unit heaters, and duct furnaces. Lennox offers a range of products within each category of HVAC Equipment, including under other brand names.

**6. The Rheem Defendants**

45. Rheem Manufacturing Co. is a privately-owned manufacturer headquartered in Atlanta, Georgia. Rheem contracts with HVAC Equipment services in the Detroit, Michigan area. Rheem Manufacturing Co. entered commercial markets for HVAC Equipment in the 1970s when it acquired Acme Industries, which was headquartered in Jackson, Michigan. Rheem Manufacturing Co. is a subsidiary of Paloma Industries, Ltd., a privately held company based in Nagoya, Japan, which acquired Rheem Manufacturing Co. in 1988. Rheem Manufacturing Co. manufactures and markets HVAC Equipment under several different brands and product lines, including Rheem, Ruud, WeatherKing, Sure Comfort, and others. In October 2024, Rheem Manufacturing Co. acquired Nortek Global HVAC from Madison Industries.

46. Heat Transfer Products Group, LLC is a manufacturer of commercial HVAC Equipment sold under brands such as Russell, Witt, Kramer, and ColdZone. HTPG is a division of Rheem Manufacturing Co., and is headquartered in Lawrenceville, Georgia.

47. The Rheem Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment.

48. Rheem produces a range of residential products such as air conditioners, air handlers, furnaces, heat pumps, and water heaters. Rheem also produces a range of commercial products such as air handlers, packaged air conditioners, packaged gas electric units, packaged heat pumps, split air conditioners, split heat pumps, electric water heaters, gas water heaters, heat pump water heaters, storage tanks, tankless electric water heaters, and tankless gas water heaters. Lennox offers a range of products within each category of HVAC Equipment, including under other brand names.

**7. The AAON Defendants**

49. AAON, Inc. ("AAON, Inc. (Nevada)") is a publicly traded Nevada corporation headquartered in Tulsa, Oklahoma. AAON manufactures and markets primarily commercial HVAC Equipment, including rooftop units, air handling units, chillers, and condensing units. During the Class Period, AAON and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, sold HVAC Equipment in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

50. AAON, Inc. ("AAON, Inc. (Oklahoma)") is a subsidiary of the AAON Inc. entity referenced above in the immediate prior paragraph. AAON, Inc. (Oklahoma) is incorporated in Oklahoma and AAON, Inc. Oklahoma engineers, manufactures, and sells highly configurable HVAC systems.

51. AAON Coil Products, Inc. is a Texas corporation and subsidiary of AAON, Inc. AAON Coil Products, Inc. engineers and manufactures semi-custom and custom HVAC systems, as well as heating and cooling coils for use in HVAC Equipment.

52. BASX, Inc. is an Oregon corporation and subsidiary of AAON, Inc. BASX engineers, manufactures, and sells a wide range of custom, high-performance cooling solutions and highly customized air handlers and modular solutions for a variety of markets.

53. The AAON Defendants are manufacturers of HVAC Equipment in the United States, including both residential and commercial HVAC Equipment.

54. AAON manufactures a range of primarily commercial products such as packaged rooftop units, split systems, air handling units, and condensing units, among others. AAON offers a range of products within each of these categories of HVAC Equipment, including under other brand names.

**8. Air-Conditioning, Heating, and Refrigeration Institute**

55. Co-Conspirator Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. AHRI is based in Arlington, Virginia. As alleged elsewhere herein, AHRI, at a minimum, facilitated the conspiracy alleged herein, and moreover, AHRI's Board of Directors is comprised of, in substantial part, executives of several Defendants.

**C. Defendants' Unnamed Co-Conspirators**

56. Unknown persons, firms, and corporations not named as Defendants participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether Plaintiff has named these co-conspirators as Defendants.

**D. Reciprocal Agency of Defendants and Co-Conspirators**

57. Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

58. Each Defendant and co-conspirator acted as the agent or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiff alleges.

**E. Defendant Parent and Subsidiary Companies Share a Unity of Interest**

59. The coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise for purposes of Section 1 of the Sherman Act and other antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws.

60. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate, and their general corporate actions are guided or determined not by two, separate corporate consciousnesses, but by one. Accordingly,

the coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise.

61. A parent and its wholly owned subsidiary always have a unity of purpose and thus act as a single enterprise whenever they engage in coordinated activity.

62. By controlling, dictating, or encouraging their subsidiaries' anticompetitive conduct in advancement of a common scheme for an illegal and anticompetitive purpose, the parent Defendants independently participated in the illegal enterprise that they entered with their subsidiaries. In doing so, the parent Defendants engaged in sufficient independent conduct and had sufficient knowledge, intent, and involvement in Operating Defendants' conspiracy to be liable under the Sherman Act and other antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws as a single enterprise with their subsidiaries.

63. During the Class Period, the parent Defendants shared a unity of corporate interest and operated as part of a single enterprise with their subsidiaries, the Operating Defendants, to advance their conspiracy.

## IV. FACTUAL ALLEGATIONS

### A. HVAC Equipment Industry Background

64. The market for HVAC Equipment in the United States is large, with some estimates putting the market size at approximately over $31 billion in 2025. Defendants collectively control approximately 90 percent of the market for HVAC Equipment production.

### 1. Residential HVAC Equipment

65. Residential HVAC Equipment encapsulates those systems used in residential settings. They include systems that regulate indoor temperature, humidity, and air quality in homes. Residential HVAC systems include furnaces, heat pumps, air conditioners, and air handlers. These often work together to move heated or cooled air throughout the home via ductwork and ventilation.

66. Residential heating equipment includes furnaces (which are fueled by either gas, oil, or electricity) and heat pumps, which provide heat by transferring warmth from the air and pulling it into the home. Residential cooling equipment, as well as heat pumps, remove heat and humidity from indoor air, releasing it outside. Residential HVAC systems include air quality components, such as filters, and systems like dehumidifiers or humidifiers to balance moisture levels in the air.

67. Many of these systems rely on ductwork, channels often made of metal which connect to the HVAC equipment and transport air from one room to another, as well as too and from the HVAC equipment. Return ducts extract air from the house back to the HVAC unit. Supply ducts then deliver warm or cool air from the HVAC equipment to an area inside a home.

68. There are three primary types of residential HVAC systems: (1) split systems, which have separate indoor and outdoor components; (2) packaged units, where all components are combined into one piece of equipment; and (3) ductless mini-split

systems, which are individual units for cooling/heating specific rooms without the use of ductwork. Ductless mini-splits are not included in the product definition in this case.

### 2. Commercial HVAC Equipment

69. Commercial HVAC Equipment includes those units designed for high-capacity heating and cooling of larger spaces. These units are often modular, rooftop units that combine heating and cooling, allowing for multiple units to be used in one building.

70. A commercial rooftop system is a self-contained system that bundles the main refrigeration, air-moving, heating, and control components in one unit. The parts consist of refrigeration (compressor, condenser coil, condenser fan, expansion device, and evaporator coil). There is also an air-handling section (fan, return-air path, outdoor-air intake hood, and air filters) as well as a heating unit.

71. Commercial HVAC also includes ducted and split systems. These are separate indoor and outdoor units connected by ducts that can be built into ceilings, boiler rooms, or utility closets in offices and other commercial buildings. These combine an outdoor condensing unit with an indoor air handler, running through ducts rather than as a single rooftop box.

72. For larger buildings, Defendants produce multi-zone heat pump systems. This includes variable refrigerant flow ("VRF") systems for offices, hotels, and other large commercial buildings. These systems offer room-by-room control and are refrigerant-only, connecting many indoor units to one or more outdoor devices to modulate refrigerant flow to each zone. They use a network of refrigerant piping to connect the outdoor systems to

the indoor ones and then use compressors to vary how much refrigerant each indoor unit gets so each zone can be heated or cooled independently.

### 3. Plaintiff Resellers and Installers

73. Plaintiff and members of the Classes are those that purchase HVAC equipment indirectly from Defendants and then resell HVAC Equipment to residential or commercial customers. This includes, but is not limited to, those businesses that indirectly buy HVAC equipment and then sell to, and install, HVAC equipment for their customers.

74. These businesses are primarily small, independent, businesses in every community across the country. As stated below, installation of HVAC Equipment can be complicated, and many residential or commercial consumers rely upon indirect purchaser resellers to install HVAC Equipment.

75. While there is no definitive census, there are likely many thousands of such indirect reseller business throughout the United States.

## B. Pricing Mechanisms in the HVAC Equipment Industry

76. Pricing of residential HVAC Equipment is generally consistent across the Defendants' brands, ranging from $2,000 to up to $15,000 depending on the model. Prices vary based on efficiency ratings, speed varieties, size/capacity, noise-reduction, and other factors. Residential HVAC Equipment installation factors include labor costs, home sizes, duct-work, and the complexity of the systems being installed. These external factors lead to significant variabilities in overall consumer cost.

77. Pricing of commercial HVAC Equipment is also generally consistent across the Defendants' brands, ranging from $5,000 to over $100,000 depending on the system. Commercial HVAC Equipment prices also vary based on efficiency ratings, size/capacity, and type of system. As with residential, commercial HVAC Equipment installation factors lead to variabilities in overall cost.

78. Prior to the commencement of Defendants' conspiracy in or around January 2020, HVAC Equipment generally experienced stable and small price increases, consistent with both what one would expect in a normal market and with general consumer price trends.

79. As reflected in **Figure 1** and **Figure 2**, *supra*, through the end of 2019, the HVAC PPI consistently tracked the CPI and the Household Appliance PPI. That all began to change in January 2020, when Defendants launched their conspiracy. The fruit of their efforts became increasingly apparent as the spread between the HVAC PPI and the CPI grew exponentially.

80. In early 2019, some HVAC companies sought to implement price increases, but these were isolated and not sustained. For one instance, on February 13, 2019, Nortek Air (now a part Rheem) announced a 6% increase for the first quarter of 2019. But other companies did not follow with similar announcements. Everything changed in 2020 and the onset of the COVID-10 pandemic.

## V. DEFENDANTS' ANTITRUST VIOLATIONS

81. Plaintiff alleges that Defendants entered into an agreement from at least as early as January 1, 2020, through the present to exchange pricing information and competitively sensitive information with the purpose of coordinating supracompetitive prices for HVAC Equipment and effect of generating historic profit margins.

82. The market structure made such a scheme feasible. With only a handful of dominant producers controlling nearly all United States HVAC Equipment production, Defendants did not need to coordinate with dozens of firms. They only needed to coordinate with each other in their respective markets.

83. Defendants' ability to restrict supply in each market was further strengthened by high barriers to entry and the long build up times required to establish new production facilities or mines. These barriers prevent competitive supply responses that would otherwise discipline Defendants' pricing.

84. As a result, Defendants were able to sustain artificially inflated HVAC Equipment prices for an extended period, forcing purchasers to pay supracompetitive prices for the necessary pieces of equipment.

### 1. AHRI's Role in the Conspiracy

85. AHRI played a central role in Defendants' conspiracy and was critical to their ability to exchange competitively sensitive information and monitor the ongoing conspiracy.

86. AHRI is the trade association that represents manufacturers of heating, ventilation, air conditioning, commercial refrigeration, and water heating equipment in North America. It is largely controlled by Defendants and their senior executives. The AHRI Board of Directors is comprised of multiple senior Defendant executives and board members. For example, the 2026 AHRI Board includes: (1) Trane's President of HVAC Americas, Holly Paeper; (2) Carrier's President of Climate Solutions Americas, Gaurang Pandya; (3) Lennox's CEO, Alok Maskara; (4) Daikin's senior executive, Yogi Uemura; (5) Rheem's President of Global Air, Mike Branson; and (6) Bosch's Regional President for the Americas, David Budzinski.

87. In their own words, AHRI acts "as an impartial central agency for gathering individual company data and distributing it in summaries covering bookings, unit shipments, sales volume, manufacturer inventories, exports, efficiencies, and market information on trading area sales. Information is compiled in various reporting formats and distributed in aggregate form to participants in monthly, quarterly, semi-annual, or annual reports."

88. To receive this information, a participant must be willing to contribute their information to AHRI. AHRI states that "AHRI statistical data is not for sale," and instead is only available to HVAC Equipment companies that also provide AHRI (and their competitors) their own confidential data. Member reports are "available to participating member companies only."

89. At the start of the conspiracy in 2020, AHRI launched a new "Analytics App and Executive Dashboard," which it describes as follows, "From individual and industry product performance data to predictive analysis, the AHRI Analytics App provides HVACR industry decision makers with actionable data needed to deliver better business results." They further explained the intent of the program as delivering "real-time program performance data, industry statistics, and the predictive analytics needed to drive results."

90. AHRI maintains a Standards Policy Committee ("StdC") that "defines the policies and procedures related to development and approval of AHRI standards, guidelines, and stand-alone appendices." In 2024, for example, AHRI's StdC was Chaired by Trane's Darcy Lee. Voting members of the StdC in 2024 also included employees from Carrier, Lennox, Rheem, and Bosch.

91. AHRI has at least two in-person board meetings each year. In 2026, those meetings are scheduled for June in Arlington, Virginia and for November in Puerto Rico.

**2. Onset of the Conspiracy**

92. As stated above, historically, HVAC Equipment pricing consistently tracked the CPI and Household Appliance PPI. However, starting in 2020, these pricing trends diverged, as shown in **Figures 1** and **2**.

93. Starting in 2020, Defendants began relying on publicly announced price increases, often through a publication named ACHR News. ACHR News is advertised as the "the weekly newsmagazine of the HVACR contractor covering residential and commercial contracting," and its website maintains centralized reporting on the specifics

of each price increase announcement. Almost all of the price increases that are presented herein were announced through ACHR News.

94. In early February 2020, AHRI held its annual meetings in Orlando, Florida. At the time, AHRI's Vice Chairman was Mike Schartz (CEO of Daikin Applied). AHRI's Board of Directors included Gary Bedard (EVP, President, and COO Worldwide Refrigeration at Lennox), Mike Branson (President at Rheem, Elizabeth Haggerty, VP and GM Global Ducted Systems at Johnson Controls), Chris Nelson (President Residential and Commercial Systems at Carrier), and Donny Simmons (President Commercial HVACR at Ingersoll Rand - at the time was Trane's parent).

95. Then in early 2020 came the onset of the COVID-19 pandemic. While the pandemic clearly had a disruptive effect on global supply chains, this also acted as a perfect cover for coordinated price increases for Defendants, a cover the Defendants would fully take advantage of, driving the prices of some HVAC Equipment to record highs.

96. Across 2020, in the wake of COVID-19, every Defendant would announce price increases, most of which were published through ACHR News. For example:

- August 28, 2020, Johnson Controls announced it was "implement[ing] a price increase of up to six percent on residential and commercial heating and cooling products," effective October 1, 2020. Johnson attributed the increase to challenges related to the COVID-19 pandemic and the "escalating frontline manufacturing costs" that resulted.

- September 30, 2020, Trane announced a price increase of up to 6% for select commercial "Trane unitary, applied, and controls equipment," effective November 7, 2020.

- October 30, 2020, AAON announced a 4% price increase on select commercial HVAC Equipment, effective January 11, 2021. Like the others, AAON announced its price increase through ACHR News.

- November 2, 2020, Trane announced price increases of up to 8%. It was reported that "[t]he increase, effective January 1, 2021, applies to Trane, American Standard Heating & Air Conditioning, RunTru by Trane and Ameristar equipment, and all parts and supply brands."

- November 9, 2020, Lennox announced they would increase prices by 4–6% on all residential and commercial equipment, effective January 18, 2021.

- December 9, 2020, Nortek Air Solutions, now part of Rheem, announced a price increase ranging from 3–9% on all its products. The company blamed the increase on "recent rises in labor rates, third-party component vendor prices, and a cost escalation on steel, copper, aluminum, and other commodities."

- December 21, 2020, Allied Air announced similar price increases of 4–6%, effective February 1, 2021.

### 3. 2021 - 2022 and the Escalation of the Conspiracy

97. Into 2021, Defendants kept the price increase momentum going, and would announce more and more increases throughout 2022 as well. For a few instances:

- March 8, 2021, Trane announced a price increase of up to 7.5% on for its commercial HVAC Equipment, effective April 9, 2021. On March 31, 2021, Trane announced an additional price increase specific to residential HVAC Equipment of up to 6%, effective April 1, 2021.

- April 12, 2021, Lennox announced a price increase of 6–9% on all residential and commercial HVAC Equipment, effective June 1, 2021.

- April 15, 2021, Daikin announced a price increase of 6% on all commercial heating and cooling HVAC Equipment, effective April 26, 2021.

- April 19, 2021, Lennox subsidiary Allied Air announced a price increase of between 5–7% beginning June 1, 2021 "[d]ue to inflationary commodity and operational costs."

- June 17, 2021, AAON announced it would be raising prices for the third time in under a year, this time by 5%. Effective September 1, 2021, AAON blamed the price increases on "inflationary pressures."

- July 2, 2021, Trane announced price increases of up to 7% on select commercial HVAC Equipment, effective August 7, 2021.

- July 9, 2021, Trane announced a price increase of up to 7% on select residential HVAC Equipment that shipped on or after August 9, 2021.

- July 23, 2021, Lennox announced an 8% price increase on residential and commercial HVAC Equipment "due to further rise in inflationary costs," effective September 1, 2021.

- September 3, 2021, Daikin announced an 8% price increase, taking effect on select commercial HVAC Equipment that shipped after January 1, 2022.

- September 21, 2021, AAON announced its fourth price increase over the prior 12 months. The company implemented another 5% price increase, effective January 1, 2022, citing "inflationary pressures" once again.

- October 26, 2021, Carrier announced a price increase effective January 10, 2022, of up to 12% on North American commercial HVAC Equipment and up to 10% on residential HVAC Equipment.

- November 3, 2021, Lennox announced a further price increase of up to 13% on residential HVAC Equipment, effective January 1, 2022.

- November 12, 2021, Allied Air (Lennox) announced a comparable price increase of up to 12% effective January 1, 2022, again pointing to "persistent inflationary costs."

- November 15, 2021, Trane announced an identical price increase of up to 12% on residential and commercial HVAC Equipment. Like Carrier, Lennox, and Allied Air, Trane made its residential increases effective January 1, 2022, and Trane's commercial increases were effective January 15, 2022. These closely timed rounds of large price increases were unprecedented in the HVAC Equipment industry.

- March 2, 2022, AAON announced a further 7% price increase on all HVAC Equipment as "a result of inflationary pressures," effective March 29, 2022.

- March 9, 2022, Carrier announced a price increase of up to 9% on residential and commercial HVAC Equipment, effective April 11, 2022.

- March 28, 2022, Lennox announced a matching price increase of up to 9% on residential and commercial HVAC Equipment, effective May 2, 2022.

- April 4, 2022, Trane announced a price increase of up to 9%—identical to the price increases announced by Carrier and Lennox less than one month prior—on residential and light commercial HVAC Equipment, effective May 1, 2022.

- April 18, 2022, Lennox subsidiary Allied Air announced a price increase of up to 9%, effective June 1, 2022, again pointing to "persistent inflationary costs."

- May 10, 2022, Daikin announced price increases of up to 12% on commercial HVAC Equipment, effective May 25, 2022.

- May 17, 2022, Trane announced a price increase of up to 18% on select commercial HVAC Equipment, effective May 16, 2022.

- May 26, 2022, Carrier announced a price increase of up to 12% on North American light commercial and commercial HVAC Equipment, effective July 11, 2022.
- July 29, 2022, Daikin announced an increase of up to 5% on commercial HVAC Equipment for all orders beginning on August 31, 2022.

- September 9, 2022, Trane nearly matched Daikin's price increase, announcing a 3–6% increase on commercial HVAC Equipment, effective September 10, 2022.

- November 14, 2022, Carrier announced a further price increase of up to 8% on North American commercial HVAC Equipment, effective December 5, 2022.

- December 5, 2022, Lennox announced it would be increasing residential and commercial HVAC Equipment prices by as much as 8%, effective January 1, 2023.

#### 4. 2023 - 2024 and Defendants Maintenance of Their Conspiracy

98. Having achieved supracompetitive price levels through their increases from 2020 through 2022, Defendants sought to maintain these high prices through 2023 and into 2024.

99. In July 2023, Lennox's CEO, Alok Maskara, stated, "Regarding price versus inflation, we are pleased to report that the industry pricing remains disciplined and our own mid-year price increase has been broadly successful." He continued, "Our outlook on both components and commodity cost inflation remains stable and unchanged, and we expect the second half of the year to deliver a positive price versus inflation spread."

100. Defendants reported through ACHR News the following increases:

- May 1, 2023, Trane announced another increase of 4–6% on commercial HVAC Equipment, effective May 5, 2023.
- August 2, 2023, Trane publicly reported, "Strong volume growth, positive price realization and productivity more than offset material and other inflation related to supply chain challenges and higher costs to serve customers."
- August 29, 2023, Bosch raised prices on heat pumps, citing "adjustments to market conditions and supply chain challenges."
- September 18, 2023, Trane announced price increases on commercial HVAC Equipment, ranging from 2% to 6%, effective October 7, 2023.
- November 14, 2023, Carrier announced a price increase of 8% on North American commercial HVAC Equipment, effective the following month.
- November 17, 2023, Trane announced raising prices by up to 5% on some residential products, effective January 1, 2024.
- December 5, 2023, Lennox's Allied Air subsidiary announced price increases of up to 10% on residential and 12% on commercial HVAC Equipment, effective on January 2, 2024.
- January 5, 2024, Carrier announced they would be raising prices by 6–10% on all products, effective March 4, 2024.
- January 18, 2024, Nortek Global HVAC (now part of Rheem) announced increases of up to 8% on all residential HVAC Equipment, effective February 26, 2024.

101. In September 2024 Lennox's CFO, Michael Quenzer spoke about the shifts that had happened over the prior years in the HVAC industry, noting "shares don't shift a lot in our industry." Market share stability is a sign of collusion as it suggests that competitors have ceased competing for business on price.

### 5. Defendants Maintain Price Increases and Maintenance Into the Present

102. Into 2025, Defendants maintained these steady price increases, further breaking from the trends in other pricing metrics like the CPI.

103. On January 2, 2025, Lennox subsidiary Allied Air raised residential parts and commercial HVAC Equipment prices by 5%, effective January 13, 2025.

104. Effective February 1, 2025, Trane announced a 10% price increase on residential HVAC Equipment.

105. In April 2025, Rheem announced price increases of approximately 6%. That same month, Lennox raised prices by another 6%.

106. On September 10, 2025, during the Morgan Stanley Laguna Conference, David Gitlin (Chairman and CEO of Carrier) and Patrick Goris (Senior Vice President and CFO of Carrier) delivered remarks and responded to questions. While answering a question on price competition, Goris remarked, "What we've seen so far this quarter is that the combination of the price and the mix up is still double-digit positive. And so that is -- obviously, that's really good."

107. Trane's CEO Dave Regnery and CFO Chris Kuehn also spoke at the conference, with Regnery revealing through their remarks that—in keeping with Lennox's

call for discipline—Trane had reduced production to manage supply: "We have taken some time out of our factory so that we can balance the inventory load within the channel."

108. During Carrier's earnings call on December 4, 2025, David Gitlin (Chairman and CEO) made it clear that Carrier viewed its prioritization of margin over market share as an example for the company's competitors should be following. He stated, "[a]nd we believe, as market leaders, that we -- it's important for us to retain pricing discipline, and you should expect that out of us as we go into next year."

109. December 2025 saw several more parallel price increase announcements. Effective December 31, 2025, Bosch increased the prices of its heat pumps, Bosch's Coleman brand increased prices by 6–8%, and Bosch implemented a 3% price increase.

110. During Trane's January 29, 2026 earnings call, Chris Kuhn (Executive Vice President and CFO) revealed that Trane "reduced factory production days by one-third" in order "to normalize residential inventory." He explained that prices had not decreased because of decisions by Trane and its competitors to keep supply short of demand: "[W]e've not seen pricing fade in the business. If I think about the fourth quarter, and pricing, it really is more due to volume being lower than anything else." Kuhn assured Trane's competitors that it would not decrease prices, explaining, "I don't want anyone to think that pricing is coming down in that market." In a competitive environment, the decision to reduce production would give away market share to one's competitors who would seize on the surrender of share. However, due to this conspiracy, Trane knew

competitors would not compete with them for market share, but instead would also restrict supply and maintain record high pricing.

111. Defendants' executives publicly discussed their consistent price increases while attending Barclays Industrial Select Conference held from February 17–19, 2026. During a presentation on February 17, in response to a question about price competition in the residential business segment, Lennox CFO Michael Quenzer once again commended the industry for its pricing discipline. Quenzer announced that Lennox would follow Trane's lead in reducing production to manage supply, stating, "So what we've been trying to do is very disciplined, kind of reduce our inventory levels …" And "[s]o what we're gonna do is reduce some production in the first quarter, keep our inventories flat."

112. Trane's CFO Chris Kuhn presented at that conference as well, announcing, "On price, the team announced a price increase just in the last 10 days. It's up to 5%, effective April 1, and so our plans are to make sure we continue to capture price to offset inflation and still get a spread on that." He explained that the company's price increase was possible because "the industry has been very disciplined in that regard over many years."

113. Two days later, David Gitlin (Carrier Chairman and CEO) announced an identical 5% increase: "If you look at our residential businesses in terms of realization rates, it's probably best as you go from west to east. In the Americas, we have 5% price that we've announced comes into place next month."

114. On March 2, 2026, Daikin raised certain commercial HVAC Equipment prices by up to 7% and increased other HVAC Equipment prices by 3.5–5%. That same

day, Daikin's Amana and Goodman brands both also announced price increases of up to 7%. Effective March 16, 2026, Allied Air (Lennox) matched Daikin's 7% increase.

**6. Defendants' Profits Increased at the Same Time**

115. At the same time as prices for HVAC Equipment skyrocketed, Defendants experienced record high profits and profit margins.

116. Throughout the conspiracy, Defendants boasted about rising and record profit margins. For instance, in mid-2024, Morningstar resumed its coverage of Lennox and observed that the company's margins rose from "from about 8% during the last sales peak in 2007 to nearly 18% in 2023." Similarly, Carrier experienced significant profit increases of around 20% from 2020 to 2021 and 2023 to 2024, which correspond closely to their price increase announcements.

117. In its 2025 Q1 Financial Report, Daikin highlighted how its "[o]perating [p]rofits achieved a new record high" despite inflation and high mortgage interest rates in the Americas.

118. During its earnings call on January 29, 2026, Trane boasted about its profit growth from 2020 to 2025, highlighting that its revenue nearly doubled from approximately $12 billion to $21 billion, representing a compound annual growth rate of approximately 11%, that its adjusted earnings per share grew at a compound annual growth rate of approximately 24% over the same period, while the company's adjusted EBITDA margin expanded by 470 basis points to reach 20% in 2025.

119. AAON similarly experienced substantial profit growth in the wake of multiple price increases and a monthly 1% price increase beginning in June 2022, with the company reporting in a May 4, 2023 press release: "Gross profit margin in the quarter increased to 29.0%, up 380 basis points from the comparable quarter in 2022. Price increases implemented over the last year combined with moderating cost inflation were the driving factors to the gross profit margin expansion."

120. Defendants' success is also visible through the Producer Price Index by Industry: Air-Conditioning, Refrigeration, and Forced Air Heating Equipment Manufacturing: Primary Products, as were shown in **Figure 1** and **Figure 2**, *supra*. The index shows a marked rise that begins in 2020 and is more abrupt and significant than any other increase in the index over at least the past 22 years:

121. Also as is evident in these **Figures**, the economic impact of the COVID-19 pandemic alone does not explain the sharp increase in the HVAC PPI. Neither the Household Appliance PPI nor the CPI rose nearly as dramatically, and the Household Appliance PPI returned to the CPI while the HVAC PPI remained elevated into the present.

## VI. ADDITIONAL PLUS FACTORS ENCOURAGING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY

122. The HVAC Equipment industry bears many of the characteristics of a highly cartelized market: (1) producer concentration; (2) high barriers to entry; (3) commodity product; (4) inelastic demand; (5) opportunities to collude; and (6) the absence of close substitutes. These characteristics supported Operating Defendants' collusion to raise and fix the price of HVAC Equipment, and maximize Defendants' profits.

### A. HVAC Equipment Market is Highly Concentrated

123. Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when only a few firms control a large share of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players.

124. A high degree of Defendants' control simplifies coordination because little outside competitive presence exists to undermine the cartel, and Defendants can more easily monitor each other's actions related to supply and pricing.

125. In a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might have achieved by undercutting their cartel price.

126. As noted above, the HVAC Equipment market is highly concentrated, with the Defendants collectively controlling approximately 90 percent of the market.

127. The HVAC Equipment market has also experienced consolidation, further increasing concentration and reducing competition. For example, in April 2023, Carrier announced the acquisition of heat pump manufacturer Viessmann Climate Solutions, which it completed in January 2024. In October 2024, Rheem Manufacturing completed its acquisition of Nortek Global HVAC, bringing the Frigidaire, Maytag, Miller, Broan, Gibson, Intertherm, and Partner's Choice brand lines under the Rheem umbrella. In August 2025, Bosch acquired Johnson Controls' residential and light commercial HVAC business for $8.1 billion, the largest acquisition in Bosch's history.

### B. The HVAC Equipment Market Has High Barriers to Entry

128. Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market and make it easier for incumbents to collude.

129. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supracompetitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

130. Barriers to entry kept would-be competitors out of the industry. It costs hundreds of millions of dollars and takes multiple years to construct a new manufacturing facility and bring it online. A new plant also means hiring and training thousands of workers to operate, maintain, and oversee the facility. For example, Daikin broke ground on the Daikin Texas Technology Park in 2015, which cost $417 million to build, took more than two years to complete, and employs approximately 5,000 people.

131. In addition to the capital expenditure necessary to open a new plant, new entrants also have to overcome brand loyalty and strong name recognition of established brands, several of which like Lennox, Carrier, Trane, Rheem, and York and have histories of over 100 years.

### C. HVAC Equipment Products Are Commodity Products

132. A commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services.

133. HVAC Equipment products are fungible, homogenous commodity products with little differentiation, and one supplier's type is readily substituted for another supplier. As a result, buyers make purchase decisions based largely, if not entirely, on price.

134. In the United States, the technology and processes for manufacturing HVAC Equipment is well established, as is the technology for the equipment itself. As a result, there is limited HVAC Equipment product differentiation. In fact, a residential furnace manufactured by one Defendant is designed to replace another manufactured by a different Defendant. The same is true for heat pumps and air conditioning condensers.

135. Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily, if not exclusively, on price as opposed to other attributes such as product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors.

136. Any observed price discrepancies for commodities are more likely to expose cheating because they cannot as readily be attributed to other factors such as special product features, quality, reliability, durability, or other terms of a transaction.

### D. Defendants Took Advantage of Multiple Opportunities to Collude

137. Operating Defendants are members of industry trade associations and forums and regularly attend industry events. These events provide opportunities to exchange pricing, supply, and other competitively sensitive information.

#### 1. AHRI

138. The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is the primary U.S. trade association for HVAC Equipment manufacturers. Trane, Lennox, Carrier, Rheem, Daikin, AAON, and Bosch are members of AHRI. AHRI hosts several events each year, including what it refers to as four premiere events.

139. Defendants' senior executives currently hold and have held leadership roles on the AHRI Board of Directors during the Class Period.

140. In 2026, Mike Branson (President of Global Air Division, Rheem) serves as Chairman and Holly Paeper (President of Commercial HVAC, Trane) serves as Vice Chairman. David Budzinski (Deputy CEO and President Americas, Bosch), Alok Maskara (CEO, Lennox), Gaurang Pandya (President of Climate Solutions Americas, Carrier), and Yogi Uemura (President, Daikin) all serve on the Board of Directors. In 2025, Mike Branson served as Vice Chairman and David Budzinski, Gaurang Pandya, Holly Paeper, and Yogi Uemura served on the Board of Directors. In 2024, Gary Bedard (Executive Vice President and President of Residential, Lennox) served as Chairman.

141. From January 31 through February 2, 2022, executives from Carrier, Trane, LG, Daikin, Rheem, and Mitsubishi were all present at the AHR Expo in Las Vegas. Later,

from March 28–30, 2022, executives from Carrier, Goodman Manufacturing (Daikin), Johnson Controls, and Rheem would all meet at the ACCA Annual Conference and Expo in St. Louis.

142. The AHRI Expo was held on February 2–6, 2023 in Atlanta, at which in attendance were executives from Daikin, Johnson Controls, and Rheem. On April 2-5, 2023, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo in New Orleans, Louisiana. At this conference, Braden Cook (Carrier), Nathan Walker (Daikin), Brandon Franks (Johnson Controls), and Randy Roberts (Rheem) participated in a panel discussion about the state of the HVAC industry.

143. The 2024 AHRI Expo was held in Chicago, Illinois on January 22–24 and was attended by executives from Carrier, LG, Mitsubishi, and Rheem. The ACCA Annual Conference and Expo followed on March 11–14 in Orlando, Florida attended by Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem. During this conference Chris Forth (JCI), Braden Cook (Carrier), John Schneider (Copeland), Doug Widenmann (Daikin), Randy Roberts (Rheem/Ruud), and Heather Buchicchio (Mitsubishi) all participated in a panel discussion about the current state of the HVAC industry.

144. The 2025 AHRI Expo was held in Orlando and was attended by executives from Daikin, Johnson Controls, LG, Mitsubishi, and Rheem. On March 23–27, 2025 in Austin, Texas, executives from Carrier, Daikin, Johnson Controls, Mitsubishi, and Rheem attended the ACCA Annual Conference and Expo.

**2. ACHR News**

145. As noted throughout this complaint, ACHR News is the greatest collection of HVAC price increase announcements. Defendants used ACHR News to signal to one another to perpetuate the conspiracy and communicate their adherence to it. Defendants extensively and nearly exclusively relied on ACHR News to immediately publish and disseminate their price increase announcements throughout the Class Period.

**3. HARDI**

146. Heating, Air-conditioning, and Refrigeration Distributors International ("HARDI") is another organization through which Defendants had numerous opportunities to collude. HARDI bills itself as the leading professional trade association for HVACR wholesale distributors, manufacturers, and representatives that "serves its members through government affairs and advocacy efforts, market intelligence and benchmarking, training programs, and world class events."

147. HARDI provided the Defendants with further opportunities to collude. For example, at the 2025 HARDI Annual Conference, a "Supplier Town Hall" was held, "dedicated to Supplier Manufacturers!" At that same Annual Conference, a roundtable discussion was held for "Manufacturer Reps Only."

148. During the Class Period, the HARDI annual conference featured speakers from Defendants (such as from Trane and Bosch) and was also sponsored by Defendants (such as Bosch, Daikin, and Rheem).

#### 4. Other Industry Events

149. Other opportunities to collude existed outside of trade organizations. One such example was the Morgan Stanley Laguna Conference, which took place from September 10–12, 2025, and was attended by senior executives from Carrier, Trane, and Lennox. At this conference, Carrier's Senior Vice President and CFO brushed aside the concept of price competition, Lennox's CFO commended the industry's price discipline and discussed his company's forthcoming price increases, and Trane's CEO talked about the company's efforts to reduce supply, consistent with Lennox's call for discipline.

150. Defendants' executives were also present and spoke at the Barclays Industrial Select Conference held from February 17–19, 2026. There Lennox's CFO spoke of the industry's discipline and mentioned price increases, while Trane's CFO announced a 5% price increase, which Carrier's CEO matched two days later.

151. These events collectively afforded Defendants' executives and other employees frequent opportunities to discuss pricing, production, and other proprietary information in an informal setting and monitor compliance with their conspiracy.

### E. Demand for HVAC Equipment Is Inelastic

152. Price elasticity refers to the sensitivity of the quantity of a good demanded by a purchaser to changes in its price. If demand is elastic, a price increase causes demand for goods to decrease significantly. Conversely, if demand is inelastic, a price increase will have little or no effect on demand. Goods with reasonable substitutes have demand that is elastic. Goods that do not are inelastic. An example of a good with inelastic demand is gas;

commuters, and the trucking and airline industries, will continue to purchase the gasoline they need regardless of price. Demand for electricity is also inelastic since it is necessary for lighting, heating, cooling, and refrigeration.

153. Inelastic demand allows a cartel to form and find success. If demand is inelastic, then cartel members can increase prices above competitive levels without the fear of consumers switching to a reasonable substitute, if there even is one. This is because the percentage decrease in the quantity demanded is smaller than the percentage increase in price.

154. Demand for HVAC Equipment is inelastic. When HVAC Equipment fails, owners rarely delay purchasing replacement equipment, even if prices are high, because of the importance of HVAC Equipment to temperature regulation, comfort, indoor air quality, and safety, especially during the winter and summer seasons

### F. There Are No Close Substitutes for HVAC Equipment

155. According to the U.S. Census Bureau's Survey of Construction, 95.4% of new single-family homes started in 2020 in the U.S. had central air conditioning, while the U.S. Energy Information Administration's 2020 Residential Energy Consumption Survey indicates that two-thirds of all U.S. homes have central air conditioning. Based on data collected by the U.S. Energy Information Administration for its 2020 Residential Energy Consumption Survey, over 73% of homes have central heating. HVAC Equipment is equally prevalent in commercial buildings. A 2023 article by the U.S. Energy Information

Administration states that 83% of commercial buildings had space heating in 2018, while 78% of commercial buildings had space cooling.

156. HVAC Equipment is vitally important to comfort and maintaining indoor air quality, and in many parts of the country it is crucial to remaining safe during periods of extreme cold or heat.

157. There are no significant substitutes for HVAC Equipment. As Lennox's CFO, Michael Quenzer, explicitly recognized, "It's not like there's a great substitute for HVAC unless people don't want to have heating and air conditioning."

## VII. ANTITRUST INJURY

158. Defendants' anticompetitive conduct had the following effects, among others:

- Price competition in the HVAC Equipment market was restrained or eliminated;
- Prices for HVAC Equipment sold by Defendants, their divisions, subsidiaries, affiliates, and co-conspirators, and, in turn, other producers, were raised, maintained, and fixed at artificially high, noncompetitive levels throughout the United States;
- Indirect reseller purchasers of HVAC Equipment were deprived of free and open competition; and
- Plaintiff and Class Members paid artificially inflated prices.

159. The purpose of Defendants' and their co-conspirators' conduct was to raise, fix, or maintain the price of HVAC Equipment above a competitive level. As a direct and foreseeable result, Plaintiff and class members paid supracompetitive prices for HVAC Equipment during the Class Period.

160. While direct purchasers were the first to pay supracompetitive prices, the overcharge was passed along the distribution chain and absorbed by Plaintiff and class members when they purchased the HVAC Equipment for their use.

161. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution to indirect purchasers. Thus, the economic harm to Plaintiff and class members can be quantified.

162. Defendants' violations of the Sherman Act and other antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws caused Plaintiff and class members to suffer injury to their businesses or property.

163. This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

## VIII. DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

164. A continuing violation restarts the statute of limitations period each time Defendants commit an overt act.

165. Plaintiff and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this action.

166. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff and members of the Class.

167. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint until early 2026, when U.S.D.A. made allegations that Defendants were engaging in anticompetitive conduct and DOJ's antitrust investigation was publicly revealed.

168. Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

169. Defendants' overt acts began a new statute of limitations because they advanced the objectives of Defendants' conspiracy. Indeed, every statement involved different facts and suggestions but sprang from the same seed—Defendants' conspiracy.

170. Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of HVAC Equipment by a Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violation that injured Plaintiff and class members and started the statutory period running again.

171. Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to

reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and class members.

## IX. CLASS ACTION ALLEGATIONS

172. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All person and entities in the United States and its territories that purchased HVAC Equipment, once or more, other than directly from Defendants, from January 1, 2020 to present for the purpose of resale of HVAC Equipment. Excluded from the Nationwide Class are the Court and its personnel; Defendants and their Co-Conspirators and their parent or subsidiary companies; the officers, directors or employees of any Defendant or Co-Conspirator; and any federal, state or local governmental entities.

173. Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")[4] on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States that purchased HVAC Equipment, once or more, other than directly from Defendants, from January 1, 2020 to present for the purpose of resale of HVAC Equipment. Excluded from the Damages Class are the Court and its personnel; Defendants and their Co-Conspirators and

---

[4] The Indirect Purchaser States include the following states: Arizona, Arkansas, California, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

their parent or subsidiary companies; the officers, directors or employees of any Defendant or Co-Conspirator; and any federal, state or local governmental entities.

174. The Nationwide Class and the Damages Class are referred to herein as the "Classes." Plaintiff reserves the right to modify the class definitions at a later date. While Plaintiff does not know the exact number of the members of the Classes, there are likely thousands of class members.

175. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of HVAC Equipment in the United States;

(b) Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

(c) The identity of the participants of the alleged conspiracy;

(d) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(e) Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(f) Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged herein;

(g) Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged herein;

(h) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

(i) The effect of the alleged conspiracy on the prices of HVAC Equipment sold in the United States during the Class Period;

(k) The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l) The appropriate class-wide measure of damages for the Damages Class.

176. Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for HVAC Equipment purchased indirectly. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

177. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

178. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

179. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiff reserves the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach more efficient.

180. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CAUSES OF ACTION

### COUNT I

**Violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3)**
**(Conspiracy in Restraint of Trade)**

181. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

182. At least as early as January 1, 2021, Defendants and their co-conspirators entered into a continuing agreement in violation of the Sherman Act. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

183. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

184. Defendants' anticompetitive acts involved United States domestic commerce and other commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising, fixing, and maintaining prices for HVAC Equipment throughout the United States.

185. The relevant product market is HVAC Equipment and the relevant geographic market is the continental United States.

186. Defendants possess market power in the Relevant Market.

187. Defendants could impose an increase in the price of HVAC Equipment collectively without causing many consumers and businesses to switch their purchases to another product. HVAC Equipment constitutes a unique product market.

188. Defendants view the HVAC Equipment products as fungible. HVAC Equipment products are generally interchangeable, permitting defendant integrators to readily to compare and match each other's pricing.

189. Defendants' collusive conduct has had the effect of (1) reducing and suppressing competition among Defendants in the market for HVAC Equipment in the United States and (2) inflating the prices of HVAC Equipment during the Class Period.

190. As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for HVAC Equipment.

191. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Nationwide Class have been injured in their business or property and will continue to be injured in their business and property by paying more for HVAC Equipment than they would have paid and will pay in the absence of the conspiracy.

192. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws. It is also a unlawful under a rule of reason analysis.

193. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## COUNT II

**Violation of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

194. Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

195. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of HVAC

Equipment in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

196. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supracompetitive prices for HVAC Equipment, including in the United States and its territories.

197. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including (a) agreeing to fix, increase, inflate, maintain, or stabilize effective prices of HVAC Equipment purchased by Plaintiff and members of the Damages Class; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

198. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of HVAC Equipment. As a direct and proximate result, Plaintiff and members of the Damages Class were deprived of free and open competition and paid more for HVAC Equipment than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

199. In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and the members of the Damages Class.

200. Accordingly, Plaintiff and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

201. Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

202. **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' conspiracies had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Arizona; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

203. **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful

trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. Each Defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of HVAC Equipment at supracompetitive levels. The violations of Cal. Bus. & Prof. Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of HVAC Equipment. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of HVAC Equipment. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for HVAC Equipment has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for HVAC Equipment provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased HVAC Equipment indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

204. **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Illinois; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiff and members of the Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

205. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Iowa; (2) HVAC Equipment prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

206. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101, *et seq*. Defendants' combinations or conspiracies

had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Kansas; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kan. Stat. § 50-101, *et seq*.

207. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Maine; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

208. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Michigan; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected

Michigan commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mich. Comp. Laws § 445.771, *et seq*.

209. **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minn. Stat. § 325D.49, *et seq*.

210. **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Miss. Code § 75-21-1, *et seq*.

211. **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was

restrained, suppressed, and eliminated throughout Nebraska; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Neb. Rev. Stat. § 59-801, *et seq.*

212. **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Nevada; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, *et seq*.

213. **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiff and

members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

214. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

215. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout New York; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, § 340, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

216. **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

217. **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-08.1-01, *et seq*.

218. **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed and eliminated throughout Oregon; (2) HVAC Equipment prices

were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

219. **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq.*

220. **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiff and members of the

Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq*.

221. **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tenn. Code Ann. § 47-25-101, *et seq*.

222. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Utah; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

223. **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vt. Stat. Ann. § 2453, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was

restrained, suppressed, and eliminated throughout Vermont; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 9 Vt. Stat. Ann. § 2465, *et seq.*

224. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

225. **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. § 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wis. Stat. § 133.01, *et seq*.

## COUNT III

**Violation of State Consumer Protection Statutes**
**(on Behalf of Plaintiff and the Damages Class)**

226. Plaintiff repeats the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

227. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

228. **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. Defendants have engaged in unfair

competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

229. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed HVAC Equipment in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq*., set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether in violation of Cal. Bus. & Prof. Code § 16720, *et seq*., and whether concerted or independent acts, are otherwise unfair, unconscionable unlawful or

fraudulent; (3) Defendants' acts or practices are unfair to purchasers of HVAC Equipment in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200 *et. seq.*; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Damages Class to pay supracompetitive and artificially inflated prices for HVAC Equipment. Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200, *et seq*. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

230. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Florida; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Fla. Stat. § 501.201, *et seq*.

231. **Illinois**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the HVAC Equipment market, a substantial part of which occurred within Illinois. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly of trade or commerce in the Relevant Market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the HVAC Equipment market. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois. Defendants' conduct misled

consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of Damages Class. Defendants' unlawful conduct substantially affected Illinois's trade and commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, *et seq*. and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

232. **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiff as a purchaser of the Defendants' goods, and which caused Plaintiff to suffer injury. Defendants took efforts to conceal their agreements from Plaintiff and the members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) HVAC Equipment price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and HVAC Equipment purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly,

Plaintiff and members of the Damages Class seek all relief available under that statute and as equity demands.

233. **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiff and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing HVAC Equipment because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of HVAC Equipment, including their illegal conspiracy to secretly fix the price of HVAC Equipment at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) HVAC Equipment price competition was restrained, suppressed and eliminated throughout New Mexico; (2) HVAC Equipment prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico;

(3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

234. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of

Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) HVAC Equipment price competition was restrained, suppressed and eliminated throughout North Carolina; (2) HVAC Equipment prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for HVAC Equipment. During the Class Period, Defendants marketed, sold, or distributed HVAC Equipment in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed HVAC Equipment in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

235. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) HVAC Equipment price competition was restrained, suppressed and eliminated throughout South Carolina; (2) HVAC Equipment prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10 *et seq*., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

236. **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vt. Stat. Ann. § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for HVAC Equipment. Defendants owed a duty to disclose such

facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of HVAC Equipment, likely misled all indirect reseller purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. Ann. § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

237. **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wis. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which HVAC Equipment were sold, distributed, or obtained in Wisconsin. Defendants

affirmatively misrepresented to all purchasers during the Class Period that Defendants' HVAC Equipment prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for HVAC Equipment was restrained, suppressed, and eliminated throughout Wisconsin; (2) HVAC Equipment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of HVAC Equipment. As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of HVAC Equipment at issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing HVAC Equipment at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiff and members of the Damages Class as they related to the cost of HVAC Equipment they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

## COUNT IV

**Unjust Enrichment[5]**
**(on behalf of Plaintiff and the Damages Class)**

238. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

239. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

240. Defendants have unlawfully benefited from their sales of HVAC Equipment because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged indirect reseller purchasers, which purchased HVAC Equipment at prices that were more than they would have been but for Defendants' unlawful actions.

241. Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiff and members of the Damages Class.

242. Plaintiff and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Damages Class.

243. Defendants have been enriched by revenue resulting from unlawful overcharges for HVAC Equipment while Plaintiff and members of the Damages Class have

---

[5] Unjust enrichment claims are alleged herein under the laws of the following states: Arkansas, Arizona, California, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

been impoverished by the overcharges they paid for HVAC Equipment imposed through Defendants' unlawful conduct. Defendants' enrichment and the impoverishment of Plaintiff and members of the Damages Class are connected.

244. There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

245. Plaintiff did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

246. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of HVAC Equipment.

247. The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of HVAC Equipment are ascertainable by review of sales records.

248. It would be futile for Plaintiff and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiff and the Damages Class with respect to Defendants' sales of HVAC Equipment.

249. It would be futile for Plaintiff and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased HVAC Equipment, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiff and the Damages Class for Defendants' unlawful conduct.

250. The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for HVAC Equipment is a direct and proximate result of Defendants' unlawful practices.

251. The financial benefits derived by Defendants rightfully belong to Plaintiff and the Damages Class, because Plaintiff and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

252. It would be inequitable under unjust enrichment principles under the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for HVAC Equipment derived from Defendants' unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

253. Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as HVAC Equipment prices remain inflated above pre-conspiracy levels.

254. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Damages Class all unlawful or inequitable proceeds they received from their sales of HVAC Equipment.

255. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect reseller purchases of HVAC Equipment by Plaintiff and the Damages Class.

## X. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Defendants as follows:

256. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

257. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unreasonable restraint of trade or commerce in violation of the Sherman Act under a *Rule of Reason* analysis; (d) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer

protection laws as set forth herein; or, alternatively, (e) acts of unjust enrichment by Defendants as set forth herein.

258. Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

259. Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

260. Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis;

261. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

262. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

263. Plaintiff and the members of the Damages Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

264. Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

265. Plaintiff and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

266. Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 22, 2026

Respectfully submitted,

By: */s/ Gerard Mantese*

Gerard Mantese (#P34424)
Kathryn Regan Eisenstein (#P66371)
**MANTESE HONIGMAN, PC**
1361 E. Big Beaver Road
Troy, MI 48083
Telephone: (248) 457-9200

gmantese@manteselaw.com
keisenstein@manteselaw.com

Michael J. Flannery (*pro hac vice* forthcoming)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
Two CityPlace Drive
Second Floor
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley (*pro hac vice* forthcoming)
Cody D. McCracken (*pro hac vice* forthcoming)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
2445 M St. NW
Suite 740
Washington, D.C. 20037
Telephone: (202) 789-3960
evelyn@cuneolaw.com
cmccracken@cuneolaw.com

David M. Cialkowski (*pro hac vice* forthcoming)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com

Sterling Aldridge (*pro hac vice* forthcoming)
Katherine Barrett Riley (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
Lexington, Mississippi 39095
Telephone: (662) 834-2488
saldridge@barrettlawgroup.com
kbriley@barrettlawgroup.com

Marco Cercone (*pro hac vice* forthcoming)
**RUPP PFALZGRAF LLC**
1600 Liberty Building
424 Main Street
Buffalo, NY 14202

Telephone: (716) 854-3400
cercone@rupppfalzgraf.com

***Counsel for Plaintiff and the Proposed Classes***